2023 IL App (2d) 230117-U
Nos. 2-23-0117 & 2-23-0118 cons.
Order filed September 6, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* S.D and A.D., Minors | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | Nos. 20-JA-42 & 20-JA-119 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Oscar D., | ) | Mary H. Nader, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's finding that respondent was unfit for failing to make reasonable efforts to correct the conditions that were the basis for removal for the children and to make reasonable progress toward the return of the minors in two overlapping nine-month statutory periods was not against the manifest weight of the evidence. We therefore affirm.

¶ 2    Respondent, Oscar D., the father of minors, S.D. and A.D., appeals the circuit court's finding of parental unfitness against him. The mother was also found unfit, but she is not part of this appeal. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On April 28, 2020, the State filed a petition to adjudicate wardship of S.D., who was born on June 2, 2018. The petition alleged, among other things, that S.D. was abused and neglected by reason of respondent's prevalent use of illicit drugs and alcohol, which created a substantial risk of physical injury and an environment injurious to the child's health and welfare. Respondent stipulated that there was an immediate and urgent necessity to remove S.D. from the home. Based on the court's findings and respondent's stipulations, the court ordered that S.D. be placed in temporary custody of the Department of Children and Family Services (DCFS) and that DCFS place respondent for case plan services, including treatment for substance abuse and domestic violence and parenting classes in accordance with section 2-10.1 of the Illinois Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-10.1 (West 2020)). Respondent was allowed supervised visits with his child.

¶ 5      DCFS instituted an initial service plan on May 28, 2020, with the permanency goal of returning S.D. home within 12 months. The service plan stated that respondent was interested in working towards reunification and that he was open to engaging in the planned services, including undergoing a psychiatric evaluation, individual therapy, a substance abuse assessment, participating in random drug screenings, and completing parenting classes. Respondent was required to advise DCFS of any changes to his contact information and maintain regular communications with the assigned caseworker. He was also required to be consistent with his visitation schedule and complete the recommended services successfully without cancellations. The desired outcome of the plan was for S.D. to "grow in a safe and healthy environment that meets all her needs." The initial service plan targeted a planned achievement date of November 28, 2020.

¶ 6    On June 10, 2020, DCFS filed a report in the circuit court stating that, among other things, respondent violated the safety plan, finding that S.D. was malnourished, had a rash, and had been locked in a closet. Respondent was referred for individual therapy, parenting classes, a substance abuse evaluation, and a psychiatric evaluation. A caseworker noted that, although respondent had a substance abuse assessment evaluation on March 12, 2020, he had not consistently attended his DCFS plan services. Respondent also began parenting classes on May 16, 2020 and individual therapy on May 29, 2020. S.D. had been placed in a foster home that DCFS found to be stable, safe, and appropriate.

¶ 7    In a July 14, 2020 DCFS report, a therapist stated that respondent failed to consistently attend his therapy sessions. He continued to attend parenting and substance abuse classes, but did not complete his psychiatric evaluation. Respondent also continued to have video chat visitations with S.D. every week. The report stated that respondent engaged well and sang songs to S.D. During in-person visitations, he brought snacks, fruit, juice, and toys to play with S.D. In addition, respondent had complied with attending June 4 and July 8 random drug screenings, which results were negative, however, he failed to appear for his June 16 drug screening. The report stated that respondent had stable employment at a restaurant for eight years, and that he moved into his mother's house.

¶ 8    An August 12, 2020 DCFS report stated that respondent visited with S.D. twice per week under DCFS supervision. The report stated that respondent appeared to be happy every time he saw S.D., running towards her, hugging her, coloring together, and playing with a ball. The report stated that, overall, respondent engaged well with S.D. Respondent continued to attend individual therapy sessions, but not consistently. Respondent completed parenting classes and the DCFS caseworker referred him to a parenting coach. Respondent stated that he continued to attend

substance abuse classes. He complied with July 6 and July 23 random drug screenings, which results were negative, however, he failed to appear at the July 27 drug screening.

¶ 9    The September 24, 2020 DCFS report stated that respondent was not attending substance abuse counseling services and noted that he had not been truthful when providing information to the DCFS caseworker. When DCFS contacted Renz Addiction Counseling Center (Renz), an employee stated that Renz had closed respondent's case file on August 20 because he failed to attend services. On August 31, 2020, respondent had returned to Renz and stated that he wanted to engage in counseling services, but when an employee provided the necessary paperwork, respondent "ran out of the building with the paperwork." Respondent returned to Renz on September 22, requesting paperwork stating that he had attended counseling in the spring. The employee told respondent to leave the building and that "he was not allowed to be there because he stole the paperwork." The Renz employee reported to DCFS that respondent "became verbally aggressive toward her[,] using profanity." In response, DCFS contacted respondent, who denied having any problems attending substance abuse counseling, until the DCFS caseworker confronted respondent regarding what had happened with the Renz employee. The report also stated that respondent stopped attending individual therapy sessions. Although respondent started attending parenting coaching classes, the parenting coach stated that respondent required "a lot of guidance." Respondent also had not completed a psychiatric evaluation. Respondent failed to attend August 31 and September 8 drug screenings. The report described respondent as "anxious and aggressive lately." Helenn McManaman, the DCFS child welfare specialist who prepared the report, recommended that respondent continue to cooperate with DCFS and its recommended services, and that S.D. continue to reside in the same foster home.

¶ 10    On September 25, 2020, the circuit court adjudicated S.D. as abused and neglected under section 2-3(1)(b) of the Juvenile Court Act, finding probable cause to believe that S.D. was abused and neglected in an environment injurious to her welfare. 705 ILCS 405/2-3(1)(b) (West 2020). The adjudication order admonished respondent that he "must cooperate with [DCFS and] comply with the terms of the service plan and correct the conditions that require the minor to be in care or [he] risk[s] termination of [his] parental rights."

¶ 11    An October 21, 2020 DCFS report stated that respondent continued to visit with S.D. twice per week. Although he attended individual therapy sessions, he was not attending substance abuse services and did not complete his psychiatric evaluation. He attended some of his random drug screenings, but failed to appear at others, including on October 5.

¶ 12    The December 8, 2020 DCFS report stated that respondent's second child, A.D., was born on November 12, 2020, and that DCFS took her into protective custody on November 18, 2020. She was placed in a foster home on November 20, 2020 and was doing well in the care of the foster parents. She had visitations with S.D. and video chat visitations with respondent once per week. On December 21, 2020, A.D. was placed in the same foster home as S.D. Respondent continued to attend individual therapy and claimed that he was attending substance abuse services, but his attendance could not be verified. He did not complete his psychiatric evaluation or domestic violence services. He also failed to attend random drug screenings.

¶ 13    McManaman completed another DCFS report in respondent's case on January 12, 2021. She reported that respondent visited with S.D. and A.D. twice per week. The therapist confirmed that respondent continued to attend individual therapy. Respondent was attending substance abuse services and Renz recommended that he receive 72 hours for treatment and a six-month after-care program. He continued to attend parenting coaching, which had later been cancelled due to the

COVID-19 pandemic. Respondent told McManaman that he started attending domestic violence services in November 2020 with the Community Crisis Center in Elgin, however, when she called to verify his attendance, an employee told her that respondent was not attending any services there. Respondent also had been referred for a random drug screening on January 5, 2021, but failed to attend.

¶ 14 On January 15, 2021, the circuit court entered an order adjudicating A.D. abused and neglected. On the same day, the court also entered a dispositional order finding respondent unfit to care for S.D. and A.D. due to his failure to cooperate with DCFS and complete the required services. The court named DCFS as the children's guardian and custodian, finding that visitation was at the discretion of DCFS. The order admonished respondent to cooperate with DCFS and comply with the terms of the service plan or risk termination of his parental rights.

¶ 15 In an April 23, 2021 permanency hearing report to the circuit court, DCFS reported that respondent exhibited "poor impulse control." He continued to attend parenting coaching and individual therapy, but "demonstrated a lack of commitment to treatment and inability to follow through with recommendations." Respondent attended substance abuse services, but also needed to attend a six-month after-care program and attend additional Alcoholics Anonymous meetings. He was denied services for domestic violence classes due to "abusive behavior." The report stated that respondent had yet to complete the services requested by DCFS and that he needed to be consistent with random drug screenings. The report also stated that respondent "demonstrated lack of commitment to treatment and inability to follow through with recommendations."

¶ 16 An April 23, 2021 DCFS service plan stated that respondent had yet to correct the condition that led to DCFS involvement. The plan stated that respondent required more time to complete the services requested by DCFS. The plan also remarked that A.D. was born and added to the services

plan. The plan provided a permanency goal of "return home within 12 months." The evaluation of respondent noted that he was not consistent with random drug screenings and was not making satisfactory progress with the required services.

¶ 17    A June 18, 2021 DCFS report stated that respondent was no longer consistently attending individual therapy sessions. He completed substance abuse services and continued attending parenting coaching during his visitations with S.D. and A.D. Respondent failed to attend domestic violence services and did not answer or return phone calls from the domestic violence service center. He also failed to appear for random drug screenings. Finally, respondent only attended 30 minutes of visitation per week instead of the two hours allotted for him.

¶ 18    On October 19, 2021, the Latino Treatment Center reported that respondent completed 72 hours of substance abuse treatment and recommended six months of continuing after-care and to attend a support group regularly. The report stated that the center attempted to contact respondent regarding continuing care, but was unsuccessful.

¶ 19    An August 26, 2021 parenting coaching discharge report recommended that S.D. and A.D. remain in their foster home, describing respondent's aggressive and uncooperative conduct during counseling sessions and visitations. Respondent did not attend to his children's basic needs, including clothing, food, and diapers. Respondent appeared anxious during visits. The report stated that respondent had a continued lack of interest and communication during visitations. The report also stated that the therapist did not recommend respondent have unsupervised visitations with his children.

¶ 20    A parenting coaching discharge report dated October 20, 2021 stated that a number of coaching sessions were canceled because the children's mother alleged respondent was threatening her safety. The report stated that respondent "has demonstrated a lack of nurturing, parenting skills,

commitment to treatment and inability to follow through with recommendations." The caseworker noted that, during visitations, S.D. showed high levels of anxiety, regression, defiant behavior, and "communication with sounds and high tone and aggression." The caseworker also noted that respondent failed to create a bond with A.D. during visitations.

¶ 21    On November 5, 2021, the circuit court entered a permanency order finding an appropriate permanency goal was to return the children home to respondent within 12 months. The court found respondent had not made reasonable and substantial progress toward returning the children home and also had not made reasonable efforts towards returning the children home. The court also found that respondent was still in need of services and specifically provided "no date within 5 months for anticipated completion and/or return." The court ordered continued guardianship of the minors to DCFS.

¶ 22    A February 15, 2022 Court Appointed Special Advocates For Children (CASA) report to the circuit court stated that respondent failed to attend at least five scheduled, weekly video calls with his children and failed to confirm at least five scheduled, weekly in-person visits. At one point, he texted CASA a picture of life insurance applications for both S.D. and A.D. CASA observed the policies included a different address than respondent previously reported. When asked if he moved to a different residence, respondent stopped responding to texts or emails from CASA. Instead, on January 24, 2022, CASA received an email and text notification that respondent requested $1,000 from CASA's PayPal account. CASA denied the request from respondent.

¶ 23    DCFS reported to the circuit court on February 16, 2022 that respondent was not complying with program requirements since the last court hearing on November 5, 2021. He was not attending any services requested by DCFS. McManaman attempted to contact respondent by email and text message, requesting to meet with him, but he did not respond. The children's mother reported that

respondent continued to stalk her. Respondent was unsuccessfully discharged from individual therapy. He was also unsuccessfully discharged from parenting coaching "due to safety, health and the wellbeing concerns" of S.D. and A.D., based on observations during visitations. The substance abuse treatment center attempted to contact respondent many times, but he did not answer the phone or return calls. He failed to complete the after-care six-month program. The report also stated that on January 31, 2022, respondent published a note with a suicide message twice on social media websites. In addition, respondent failed to attend random drug screenings. Further, the domestic violence services center denied services for him because he denied that he was perpetrating abusive behavior. He also failed to complete a psychiatric evaluation. Finally, he was inconsistent with virtual and in-person visitations with his children. DCFS cancelled two visitations "due to his erratic and unsafe behaviors toward the children." The report described how during one of the visitations in November 2021, respondent locked himself in a bathroom with S.D. and A.D. S.D. reported that respondent splashed water onto her face. In a January 29, 2022 visit, respondent removed S.D.'s facemask and attempted to exchange his mask with hers. The foster parents intervened to prevent him from doing so.

¶ 24    A March 28, 2022 DCFS report to the circuit court detailed that respondent was arrested on March 9, 2022 because he failed to attend a court hearing. On March 17, 2022, he was arrested and incarcerated for burglary and DUI. The children's mother reported to DCFS that respondent continued to threaten her and called her frequently. Respondent had requested a visitation on March 17, 2022, but did not attend the scheduled visitation on March 19, 2022, and failed to call and cancel the visitation. During a March 26, 2022 visitation, the caseworker observed respondent forcing S.D. to hug him even though she verbalized that she did not want to be hugged or carried. Respondent nevertheless picked up S.D. and failed to put her down after she asked him to do so.

He behaved oddly during the visitation and "made nonsense small talk" with the caseworker. He failed to appear at random drug screenings. The report also stated that on December 6, 2021, he had tested positive for amphetamines. After he was arrested on March 17, 2022, he was sent to the hospital for methamphetamine treatment. Finally, the report noted that the mother requested the surrender of her parental rights to the children's current caregivers and that DCFS was in the process of screening the case for termination of parental rights.

¶ 25    On April 1, 2022, the circuit court entered an order temporarily suspending respondent's visitations until further order of court.

¶ 26    DCFS filed another report in the circuit court on April 13, 2022, stating that the caseworker called respondent and sent emails and text messages requesting a meeting to discuss services, but he did not respond. He failed to attend any services requested by DCFS. The report stated that respondent had missed many in-person and virtual visits with his children, and that when he did attend, he used his time to ask S.D. for updates regarding her mother. The caseworker met with respondent on April 6, 2022. She reported that during the meeting, respondent appeared more concerned about the mother than his children. He reported to the caseworker that he was unemployed. Respondent also did not attend random drug screenings, including one on April 4, 2022.

¶ 27    DCFS filed another service plan on April 28, 2022, with the permanency goal of returning the children home within 12 months, but stating that respondent had made unsatisfactory progress and had not yet corrected the condition that led to DCFS involvement.

¶ 28    On May 31, 2022, the biological mother of the children surrendered her parental rights and consented to the adoption of S.D. and A.D.

¶ 29    A June 14, 2022 DCFS report to the circuit court stated that respondent was arrested and incarcerated on April 24, 2022 for domestic battery. He had attacked his mother a couple of times and she requested an order of protection. The report also stated that the foster parents were referred to adoption conversion classes beginning on June 15, 2022.

¶ 30    On June 24, 2022, the State filed a petition to terminate respondent's parental rights, arguing he failed to make reasonable efforts to correct the conditions that were the basis for removal of his children under section 1(D)(m)(i) of the Illinois Adoption Act (Adoption Act) (750 ILCS 50/1(D)(m)(i) (West 2020)) and that he also failed to make reasonable progress toward the return of his children under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)). The State argued that it was in the best interests of the minors that all of respondent's parental rights be permanently terminated and that DCFS be appointed the guardian of the minors.

¶ 31    DCFS filed a report with the circuit court on July 11, 2022, stating that respondent appeared at the courthouse on June 24, 2022 and "appear[ed] to be under influences of substances." While he spoke to McManaman, he became "verbally aggressive toward his mother because the mother was telling him what he need[ed] to do."

¶ 32    On July 15, 2022, the circuit court entered a permanency order granting the State leave to file a petition for termination of parental rights. The court found that respondent had no contact with DCFS, failed to participate in the necessary services, and could not provide a safe and stable environment for S.D. and A.D. The court also ordered DCFS to file a service plan updating the goal to "substitute care pending termination of parental rights."

¶ 33    On the same date, the State filed its petition to terminate parental rights, arguing that, under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), respondent failed to make reasonable efforts to correct the conditions that were the basis for removal of the children

during the nine-month period after the adjudication of neglect, alleging overlapping nine-month periods of April 23, 2021 through January 23, 2022, and September 23, 2021 through June 23, 2022. The State also alleged that respondent failed to make reasonable progress toward the return of the children under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)) for the same overlapping nine-month periods. On September 15, 2022, the circuit court ordered the State to serve respondent in the Kane County Jail with a copy of the petition for termination and a summons to appear for the termination hearing.

¶ 34     On September 29, 2022, DCFS instituted a new service plan for respondent, changing the permanency goal to "substitute care pending court determination" of termination of parental rights. The service plan stated that parental termination "is set for [respondent] and [respondent] has stated intentions to also sign surrenders to current foster parents," and that the current foster parents were willing to adopt the children.

¶ 35     On March 10, 2023, the circuit court heard the State's petition for termination of respondent's parental rights. McManaman testified that she was assigned as the child welfare specialist for this case beginning on April 24, 2020. McManaman confirmed that the children's mother surrendered her parental rights and signed a consent for their adoption. She testified that the minors initially came under the care of DCFS due to respondent's substance abuse and domestic violence. DCFS recommended that respondent participate in individual parenting classes, therapy, substance abuse evaluation, domestic violence classes, random drug screening, parenting coaching, and a psychological evaluation. McManaman stated that respondent failed to complete these services. She continually reminded respondent to complete the services and attempted to provide the necessary resources for him to do so. McManaman testified that respondent had been arrested and incarcerated for burglary and domestic violence. The visitations

with his children were inconsistent. Respondent failed to correct the conditions that brought the minors under DCFS care. Visitations were suspended due to his inappropriate behavior during the visitations. She testified and authenticated each of the DCFS service plans and reports that detailed the occurrence of events leading to the parental termination hearing.

¶ 36 Respondent testified that he had been arrested a number of times since DCFS opened its case in 2020. He confirmed that he had been arrested for possession of controlled substances, DUI, burglary, and domestic violence. He stated that he had completed parenting classes and 72 hours of substance abuse counseling. Respondent did not complete the substance abuse after-care program because he "was working a lot." He did not speak to McManaman regarding how to complete services during his busy work schedule. He stated that the breakup of his marriage affected his job. Respondent stated that he did complete his psychiatric evaluation and provided the paperwork to McManaman.

¶ 37 Following witness testimony and the parties' argument, the circuit court found as follows:

"I've heard the testimony and the evidence of both parties. I've had the ability to observe and judge the credibility of the witnesses. I heard the testimony of Helenn McManaman from DCFS, and her testimony was that the respondent was unsuccessfully discharged from individual therapy. His random [drug] screens were inconsistent. His psychological evaluation never happened even though she reminded him several times and gave him ideas and options. His parenting coaching was discharged as an unfit parent. His domestic violence assessment, he was in total denial, so therefore he couldn't be assessed. [H]is substance treatment, he took the treatment, but did not complete the aftercare. And probably because he didn't complete the aftercare, he then had a DUI and a drug charge.

But yet when [respondent] testifies, it's everybody else's fault. His testimony is self-contradictory. His conversation is disjointed, tangential. He has a total lack of credibility.

\*\*\*

I don't believe he's made reasonable efforts. I don't believe there's been any progress. And the only progress that he may have had was the courses he took for substance abuse and that was disqualified by subsequent arrests. So I do believe the State has proved by clear and convincing evidence that \*\*\* for the reasons set forth in the Adoption Act, that he meets the statutory definition of an unfit parent."

¶ 38 On March 13, 2023, the circuit court entered an order finding respondent was an unfit parent. The court also held that the State had met its burden of proof by a preponderance of the evidence and concluded it was in the best interests of the minors that all parental rights of respondent be terminated and that the minors be placed under DCFS guardianship. This appeal followed. Respondent contests only the court's findings regarding unfitness and does not contest the court's decision regarding the best interests of the minors.

¶ 39                                      II. ANALYSIS

¶ 40 Before considering the merits of this appeal, we first note that respondent has filed a brief in violation of Illinois Supreme Court Rule 341(h)(6) (Ill. S. Ct. 341(h)(6) (eff. May 25, 2018)) for failure to provide an appropriate statement of facts. The State's response brief stated that respondent's statement of facts "is generally sufficient to present the issues for review," but also noted that respondent's brief is in violation of Rule 341(h)(6). Respondent's "statement of facts" consists of less than three pages with inaccurate references to pages of the record indicating where pleadings, reports, and testimony are located in the record on appeal. Respondent also included

unnecessary argument and commentary, such as noting that McManaman's testimony was "at times difficult to follow," without providing what could have been helpful clarification to this court. The lengthy record on appeal contains impounded records, however, the appellant is still required under Rule 341(h)(6) to provide a statement of facts, "which shall contain the facts necessary to an understanding of the case, stated accurately and fairly *without argument or comment, and with appropriate reference to the pages of the record on appeal*," which respondent failed to do. (Emphasis added.) Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). Considering that the record consisted of hundreds of pages detailing DCFS service plans, reports, and the testimony of caseworkers assigned to respondent's case, respondent's "statement of facts" is nothing more than a cursory summary of events, without providing necessary information explaining to this court what had actually occurred within the nine-month statutory period leading to parental termination. This court "is not merely a repository unto which an appellant may 'dump the burden of argument and research.' " *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)). The rules of procedure concerning appellate briefs are rules, not mere suggestions, and it is within our discretion to strike a brief and dismiss the appeal for failure to comply with those rules. See *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999).

¶ 41    Nevertheless, "Rule 341 is an admonishment to the parties" rather than "a limitation upon this court's jurisdiction." See *In re A.H.*, 215 Ill. App. 3d 522, 529 (1991) (citing *Wilson v. Illinois Benedictine College*, 112 Ill. App. 3d 932, 936 (1983)). Although we may strike respondent's brief and dismiss the appeal for failure to comply with the rules of procedure for filing appellate briefs, in the interests of justice, we will address the merits of this appeal, but we admonish appellate counsel to comply with Rule 341, particularly considering the serious nature of these proceedings. This court has recognized "parental rights and responsibilities are of deep human importance, and

thus, will not lightly be terminated." *In re A.H.*, 215 Ill. App. 3d at 530 (citing *In re A.T.*, 197 Ill. App. 3d 821, 825 (1997)). The quality of appellate representation should reflect the seriousness of these proceedings.

¶ 42    Turning to the merits of respondent's appeal, he argues that the circuit court erred when it found him unfit due to his failure to (1) make reasonable efforts to correct the conditions that were the basis for the removal of the children (750 ILCS 50/1(D)(m)(i) (West 2020)), and (2) make reasonable progress toward the return home of the children (750 ILCS 50/1(D)(m)(ii) (West 2020)). He contends that the circuit court's decision was a drastic measure, requiring reversal.

¶ 43                    A. Termination of Parental Rights and Standard of Review

¶ 44    Section 2-29 of the Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). During the first step, the State must prove by clear and convincing evidence that the parent is "unfit" as that term is defined in section (1)(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2020); *In re M.I.*, 2016 IL 120232, ¶ 20. When ruling on parental fitness, the circuit court does not consider the child's "best interests." *In re M.I.*, 2016 IL 120232, ¶ 20. If the court finds a parent unfit, it then considers the "best interests" of the child in determining whether parental rights should be terminated. *Id.* (citing *In re J.L.*, 236 Ill. 2d 329, 337 (2010)). The issue at this step of the proceedings is not whether the parent's rights may be terminated, but instead whether they should be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home." *Id.*

¶ 45    We review the circuit court's parental fitness findings to determine if they are against the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 495 (2002). "A determination will be

found to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence presented." *Id*. at 498. Under this standard, the court is afforded deference because "it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *Id.* at 498-99. As a court of review, we may not "substitute [our] judgment for that of the [circuit] court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* at 499. "A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) (citing *In re D.D.*, 196 Ill. 2d 405, 422 (2001)).

¶ 46          B. Reasonable Efforts to Correct the Conditions for Basis of Removal

¶ 47     Respondent argues that the service plan "heaped an excessive amount of services on his plate during a time in which he was depressed, working many hours, attempting to do classes, and ultimately trying to process and being continually upset about the breakdown of his marriage." He contends that DCFS did not do anything to help him with his struggles. Although he acknowledges that his incarceration and drug screen failures should not be ignored by this court, he argues that the service plan "put him in place where he could only fail."

¶ 48     Section 1(D)(m)(i) of the Adoption Act concerns the failure of a parent "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." 750 ILCS 50/1(D)(m)(i) (West 2020). This court has explained that reasonable *efforts* under section 1(D)(m)(i) and reasonable *progress* under section 1(D)(m)(ii) "are two different grounds for finding a parent unfit in section 1(D)(m)." *In re Daphnie E.*, 368 Ill.

App. 3d at 1066. "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent, and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person." (Internal citations omitted.) *Id.*

¶ 49    In this case, the State's termination petition alleged two overlapping nine-month periods, from April 23, 2021 to January 23, 2022, and from September 23, 2021 to June 23, 2022, for respondent's failure to make reasonable efforts to correct the conditions that were the basis of the children's removal. The evidence presented at respondent's fitness hearing and set forth in detail above clearly and convincingly establish that he failed to make reasonable efforts during both overlapping nine-month periods following adjudication. The State initially filed its petition for adjudication of wardship due to respondent's substance abuse and domestic violence. The petition specifically stated that respondent had tested positive for cocaine, marijuana, and alcohol, and that he had "stood in the street waiving a knife threatening to hurt himself." The petition also alleged respondent's aggressive and dangerous conduct while under intoxication, along with the risk of physical injury to S.D.

¶ 50    Respondent's initial service plan, dated May 28, 2020, stated that respondent had expressed his interest in working towards reunification and completing the necessary services implemented by DCFS, but his actions belied that interest. The service plan recommended substance abuse counseling, random drug screening, a psychiatric evaluation, individual therapy, a domestic violence assessment, and parenting interventions, which included parenting classes and coaching. At the parental fitness hearing, respondent testified that, at the time of the adjudication of neglect, when the case plan was implemented, he understood the expectations placed upon him to qualify for reunification. Although respondent completed the parenting classes, he was unsuccessfully discharged from the parenting coaching classes on August 26, 2021, and failed to reengage in those

services. In addition, he missed visitations because he failed to confirm 24 hours in advance. Further, during the identified statutory nine-month periods, he behaved inappropriately and appeared to be under the influence during visitations with S.D. and A.D. During one visit, he grabbed the kids away from the therapist. In another incident, he locked himself in a bathroom with S.D. and A.D. for 20 minutes. He also acted erratically and focused more on the collapse of his marriage than his children. In March 2022, he was arrested for burglary and visitations were suspended in an April 22, 2022 order "until further order of court." Respondent testified that he was made aware of what he needed to do in order to have the visitations reinstated and acknowledged that he failed to take the necessary steps.

¶ 51    Respondent also missed numerous random drug screenings and failed to complete the drug after-care program as required. The caseworker reminded respondent five separate times to complete the services for substance abuse. Although he testified that he completed a psychiatric evaluation, there was no documentation confirming his claim. He denied treatment for domestic violence because he claimed that he did not commit domestic violence. Indeed, the evidence instead showed that respondent continued to stalk the minors' mother. Further, he was incarcerated on April 24, 2022 for domestic battery after attacking his mother. He was also unsuccessfully discharged from individual therapy on July 26, 2021, due to his lack of participation. The discharge summary stated that he stopped attending sessions on March 20, 2021 and did not respond to phone calls or text messages. He was provided a new referral on December 21, 2021, but failed to reengage in individual therapy.

¶ 52    In sum, during the overlapping nine-month statutory periods under section 1(D)(m)(i) of the Adoption Act, respondent failed to engage in service plan directives related to parenting, substance abuse, individual therapy, domestic violence, and psychiatric health. Indeed, he was

incarcerated during the statutory period for the same conduct (substance abuse and domestic violence) that led to the removal of S.D. from his custody, as well as additional criminal conduct (burglary). During respondent's parental fitness hearing, he was asked whether "there was anything stopping you or interfering with [his] ability to complete [the] case plan." Respondent stated, "[n]o, there was nothing stopping me [from] completing my case." He stated that he was "responsible, you know, to be the dad *** that I have to be." Thus, respondent knew that he was responsible for his failure to complete the services necessary for reunification and had no one to blame other than himself.

¶ 53    We have carefully reviewed the record and find that the State proved by clear and convincing evidence that respondent failed to make reasonable efforts to correct the conditions that were the basis of the removal of his children during the overlapping nine-month statutory periods following the adjudication of neglect. The circuit court's finding that respondent was unfit under section 1(D)(m)(i) was not against the manifest weight of the evidence.

¶ 54                    C. Reasonable Progress Toward the Return of the Children

¶ 55    Respondent next argues that the circuit court erred when it found that he failed to make reasonable progress toward the return of his children. He acknowledges in his opening brief that he "slipped in a downward trend with his incarcerations" and random drug screens. He contends that he "made a minimum progression by completing some services." He argues that this progress should not be ignored when evaluating his overall progress, considering the drastic step of terminating his parental rights.

¶ 56    Section 1(D)(m)(ii) of the Adoption Act involves the failure of a parent "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2020).

Under this section, "reasonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d at 1067 (citing *In re Allen*, 172 Ill. App. 3d 950, 956 (1988)). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id.* "The benchmark for measuring a parent's progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with service plans and the court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known and would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.* (citing *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)).

¶ 57    Here, the record shows that S.D. was removed from respondent's custody due to his substance abuse and domestic violence concerns. On December 6, 2021, he tested positive for amphetamines. He failed to attend numerous random drug screenings and complete the substance abuse program required by DCFS. Indeed, respondent failed to complete all the services required under the DCFS service plan. He was unsuccessfully discharged from a number of services due to his failure to participate, including treatment for domestic violence. When the caseworker or service employees attempted to contact respondent to reengage him in services, he failed to respond. DCFS reported that on April 13, 2022, he was not attending any of the required services. By that point, he had missed many in-person and virtual visits with his children. When he did attend visits, he used his time to ask S.D. for updates regarding her mother, behaved oddly, and would force S.D. to hug him and picked her up even though she verbalized that she did not want to be carried. Most significantly, during the statutory nine-month period under section 1(D)(m)(ii),

respondent was arrested and incarcerated for failing to attend a court hearing, burglary, DUI, and domestic battery. After his arrest for DUI, he was sent to the hospital for methamphetamine treatment. The children's mother reported to DCFS in March 2022 that respondent continued to threaten her and called her frequently.

¶ 58    In this case, respondent's noncompliance with the DCFS service plan and incarceration for the same conduct that resulted in the removal of S.D. from his custody objectively demonstrates his failure to make reasonable progress toward the return of his children. This court has held that personal circumstances preventing the parent from making reasonable progress, such as incarceration, "is irrelevant to the 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89 (citing *In re L.L.S.*, 218 Ill. App. 3d at 461). "A service plan is an integral part of the statutory scheme for measuring progress toward the goal of reunification of the parent and the child." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 23 (citing *In re C.N.*, 196 Ill. 2d at 215).

¶ 59    Here, the service plan reasonably related to remedying the conditions that gave rise to the finding of child abuse or neglect and caused the removal of S.D. and A.D. from respondent's custody. *Id*. The record amply supports the conclusion that he failed to comply with the service plan. Respondent did not make substantial progress towards the return of S.D. and A.D. to his care. Respondent made a minimal effort, at best, to make any progress toward a return home. Therefore, the circuit court's finding that the State proved by clear and convincing evidence that respondent was unfit to parent the children under section 1(D)(m)(ii) of the Adoption Act was not against the manifest weight of the evidence.

¶ 60    The State need prove only one statutory definition of unfitness to effectuate the termination of parental rights. See *In re A.S.B.*, 393 Ill. App. 3d 836, 843 (1997). In this case, we have found

no error in the circuit court's findings of unfitness under either section 1(D)(m)(i) or 1(D)(m)(ii) of the Adoption Act for both overlapping statutory periods.

¶ 61    Finally, respondent raised no claim of error regarding the circuit court's decision that it was in the best interests of the minors to terminate his parental rights. Therefore, we affirm the circuit court's termination of respondent's parental rights based solely on its finding that respondent was unfit. See *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 35 ("as respondent does not contest the trial court's best interest finding, we conclude that the court's order terminating respondent's parental rights was appropriate").

¶ 62                                III. CONCLUSION

¶ 63    Based on the foregoing, we affirm the judgment of the circuit court of McHenry County.

¶ 64    Affirmed.